**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

AMTAX HOLDINGS 227, LLC,

                          Plaintiff,

           v.

COHNREZNICK LLP,

                         Defendant.

Index No.: _____

**COMPLAINT**

---

Plaintiff AMTAX Holdings 227, LLC ("AMTAX" or "Plaintiff"), through its attorneys, Glenn Agre Bergman & Fuentes LLP, brings this action against Defendant CohnReznick LLP ("CohnReznick") and alleges as follows:

## NATURE OF THE CASE

1. This is an action for breach of fiduciary duty, professional negligence, and fraud. AMTAX is a limited partner investor and 99.99% owner in a low-income housing tax credit ("LIHTC") partnership that was formed to own a single affordable housing project in Massachusetts (the "Property"). CohnReznick has been the auditor and tax preparer for this partnership for approximately twenty years. The primary focus of CohnReznick's work for all those years has been to protect the tax attributes of the partnership for the benefit of AMTAX. CohnReznick was aware at all times that AMTAX was relying on CohnReznick's objectivity and integrity in providing its professional services, all of which impacted AMTAX as the 99.99% owner.

2. Beyond the professional duties CohnReznick owes to AMTAX, Plaintiff had a special relationship of trust and confidence with CohnReznick related to AMTAX's tax position—specifically, as it relates to historical tax calculations provided by CohnReznick and

relied upon by AMTAX. Plaintiff therefore counted on CohnReznick to be a loyal fiduciary with respect to a crucial and highly consequential calculation of AMTAX's tax liability upon a sale of the Property. However, CohnReznick betrayed that trust.

3.     This tax liability that AMTAX will incur upon a sale of the Property is commonly referred to in the industry as "Exit Taxes." The proper calculation of Exit Taxes is critical for two reasons. First, a failure to properly perform this calculation could compromise the tax benefits earned by the limited partner over the life of the partnership. Second, Section 42(i)(7) of the Internal Revenue Code (the "Code") permits certain eligible parties to hold a right of refusal ("ROFR") to purchase a LIHTC property for a statutory minimum price that must include payment of the limited partner's Exit Taxes.

4.     CohnReznick has known for many years that AMTAX's Exit Taxes would be substantial given its capital account balance with the partnership, which has been growing progressively more negative since 2010. Indeed, CohnReznick has annually confirmed to AMTAX and the Internal Revenue Service ("IRS") that any sale of the Property, pursuant to the ROFR or otherwise, would generate a sufficient taxable gain to offset the deficiency in AMTAX's capital account.

5.     Additionally, in 2017, 2018, and 2019, CohnReznick calculated what AMTAX's Exit Taxes would be upon a sale of the Property. Each time, it performed the calculation based on AMTAX's negative capital account balance and the corresponding gain it would recognize from the sale of the Property, which is consistent with both standard industry practice and CohnReznick's own public guidance.

6.     However, everything changed in 2020. Casting aside any pretense to impartiality, CohnReznick entered into a *secret agreement* with the partnership's general partner *to exclude*

AMTAX's Exit Taxes when calculating the statutory minimum price that the general partner's corporate parent (as the ROFR purchaser) would have to pay to purchase the Property pursuant to a Section 42(i)(7) ROFR. CohnReznick performed this concocted and erroneous calculation—which directly contradicted over a decade of work that CohnReznick had performed for AMTAX's benefit—even though it knew the general partner intended to use the calculation to cheat AMTAX out of millions of dollars of Exit Taxes that are contractually and statutorily required to be paid to AMTAX upon a sale of the Property pursuant to the ROFR.

7.     While CohnReznick's secret engagement created an egregious conflict of interest, CohnReznick did not disclose the existence of this separate engagement to AMTAX. Rather, the firm hid its involvement in the ROFR calculation by providing the calculation to the general partner in a document without CohnReznick's letterhead or any other indicia of authorship. That highly unusual conduct for a national accounting firm betrays CohnReznick's knowledge that it was violating duties owed to AMTAX.

8.     CohnReznick's gross violations of its fiduciary duties and professional responsibilities have subjected AMTAX to millions of dollars in damages. Those damages include, but are not limited to, over $500,000 in legal fees and costs AMTAX has incurred in a separate action to set aside CohnReznick's sham ROFR calculation, and at least $8.5 million in Exit Taxes that AMTAX is entitled to receive upon a sale of the Property pursuant to the ROFR, based on its current capital account, but that CohnReznick has excluded from the statutory minimum purchase price under Section 42(i)(7). This action has been brought to recover those damages and to obtain any other relief to which AMTAX is entitled.

## PARTIES AND RELEVANT NON-PARTIES

9.      Non-party Tenants' Development II, LP (the "Partnership") is a Massachusetts limited partnership formed in 2003 pursuant to Section 42 of the Code for the purpose of owning and operating the Property.

10.     Plaintiff AMTAX is an Ohio limited liability company. AMTAX is the Partnership's investor limited partner and owns 99.99% of the Partnership's interests. AMTAX provided more than $12 million in capital for the Partnership to develop the Property.

11.     Non-party Alden Torch Financial LLC ("Alden Torch") is an investment management company based in Denver, Colorado that manages a portfolio of LIHTC investments, including AMTAX's interests in the Partnership. By virtue of its management by Alden Torch, AMTAX operates exclusively in Colorado and the harm to AMTAX alleged herein was thereby sustained in Colorado.

12.     Defendant CohnReznick is a New Jersey limited liability partnership that is registered to do business in New York. CohnReznick's headquarters are located at 1301 Avenue of the Americas, New York, NY 10019. CohnReznick has offices throughout the United States, including California, Connecticut, Florida, Georgia, Illinois, Massachusetts, Maryland, New York, North Carolina, New Jersey, Texas, and Virginia. CohnReznick provides accounting and auditing services to numerous LIHTC partnerships for which Alden Torch represents the investor interests.

13.     Non-party Tax Credit Holdings III, LLC ("TCH") is a Delaware limited liability company. TCH is the Partnership's special limited partner and owns 0.001% of the Partnership's interests. Like AMTAX, TCH is managed by Alden Torch.

14.     Non-party Tenants' Development II Corporation (the "General Partner") is a Massachusetts corporation. The General Partner is the Partnership's general partner and owns 0.009% of the Partnership's interests.

15.     Non-party Tenants Development Corporation (the "GP Affiliate") is a Massachusetts corporation. The GP Affiliate is the parent and sole owner of the General Partner. The GP Affiliate is not a partner in the Partnership, but holds a ROFR that, if triggered, allows the GP Affiliate to purchase the Property from the Partnership for a statutory minimum price pursuant to Section 42(i)(7).

## JURISDICTION AND VENUE

16.     This court has subject matter jurisdiction in this action pursuant to 28 U.S.C. §§ 1331 and 1340 because the action raises necessary, disputed, and substantial issues relating to Section 42(i)(7) of the Code and its interplay with other provisions of the Code and corresponding federal regulations that extend well beyond Section 42, including but not limited to Sections Section 1.704-2(b)(2) and 1.1001-2 of the Treasury Regulations.

17.     Determining the correct construction of Section 42(i)(7) "is a purely legal question that is substantial and will be applicable to many other LIHTC agreements nationwide." *Riseboro Cmty. P'ship Inc. v. SunAmerica Hous. Fund No. 682*, 401 F. Supp. 3d 367, 376 (E.D.N.Y. 2019). Moreover, the exercise of federal jurisdiction is particularly appropriate here because CohnReznick's improper interpretation of the statute imperils the structure of the federal LIHTC program.

18.     Federal jurisdiction over this action will not disrupt or disturb any congressionally approved balance of federal and state judicial responsibilities because the issues in this case are unique and specific to the application of federal tax provisions related to the LIHTC program.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because
CohnReznick's headquarters are located in the District and a substantial part of the events giving
rise to the claim either occurred in the District or emanated forth from the District.

## FACTS

### I.     Background on LIHTC Partnerships and CohnReznick's Critical ROFR Calculation

#### A.     The Partnership and the Property

20.     The Partnership was created for the purpose of (a) redeveloping and owning the
Property, a 185-unit scattered site affordable housing development located in Boston,
Massachusetts, and (b) obtaining an award of federal tax credits under Section 42 of the Code
(the "LIHTC Program"). The Partnership is governed by its Amended and Restated Agreement
of Limited Partnership, dated June 20, 2003 (as amended, the "Partnership Agreement").

21.     The Property includes the Partnership's leasehold interest in the land, as well as
the affordable housing improvements located thereon.

22.     AMTAX contributed approximately $12 million in capital to redevelop the
Property. In exchange, AMTAX received a 99.99% ownership stake in the Partnership and the
corresponding right to tax credits and other significant tax benefits generated by the Property.
The General Partner is the .009% owner of the Partnership and contributed less than $1,000 in
capital.

23.     The GP Affiliate made various loans to the Partnership and is also owed accrued
ground lease payments under the terms of a ground lease between the Partnership and the GP
Affiliate (collectively, the "Nonrecourse Debt"). As of December 31, 2021, the outstanding
balance of the Nonrecourse Debt was approximately $25 million.

### B.     The LIHTC Program

24.     Congress created the federal LIHTC Program as part of the Tax Reform Act of 1986, which largely eliminated tax shelters that had previously provided tax incentives for capital investment in affordable housing. *See* Michael J. Graetz & Deborah Schenk, Federal Income Taxation: Principles and Policies, 371-72 (7th ed. 2013) (describing efforts in the early to mid-1980s to eliminate tax shelters created through "passive investments," culminating in the enactment of the Tax Reform Act of 1986).

25.     Congress replaced those incentives with federal tax credits that could be earned in a manner consistent with tax principles codified in the Code. *See* Tracy A. Kaye, Sheltering Social Policy in the Tax Code: The Low-Income Housing Tax Credit, 38 Vill. L. Rev. 871, 873 (1993).

26.     The LIHTC Program encourages private investment in affordable housing by providing federal tax credits to owners of affordable housing projects that comply with certain rent restrictions and other requirements set forth in Section 42. These tax credits are earned over a fifteen-year period that is referred to in the industry as the "compliance period."

27.     Under the Code, tax credits may only be used by bona fide "owners" of affordable housing properties and only in an amount proportionate to such ownership interest. As a result, LIHTC projects are typically structured as a limited partnership between one or more investor limited partners and one or more general partners.

28.     Because the general partners usually seek to raise as much capital as possible while still retaining some ownership in the project, the investor limited partners typically provide 99% or more of the necessary capital in exchange for a commensurate ownership stake. Although general partners usually have a very small ownership stake of 1% or less, they

typically receive substantial fees for developing and operating the projects, as well as most of the cash flow generated from property operations.

29.     Under the longstanding "economic substance" doctrine of tax law, an investor is deemed an owner for tax purposes—and thus eligible to receive tax credits and other tax benefits—only if the investment has economic substance, apart from the tax benefits, including upside potential and downside risk.

30.     LIHTC partnerships such as the Partnership have heightened tax considerations compared with a typical partnership. Accountants, such as CohnReznick, therefore play an instrumental role in safeguarding the investor limited partner's tax benefits.

31.     CohnReznick understands the key role played by accountants in this industry. On information and belief, CohnReznick provides accounting and auditing services to hundreds of LIHTC partnerships and LIHTC investment funds that contribute capital to those partnerships. The firm also advertises itself as "a long-standing leader in low-income housing tax credits, and an international authority on affordable housing projects." CohnReznick boasts that it has been involved in the LIHTC Program since its inception, and "has the nation's most experienced, well-versed and well-connected team in the nation."

**C.     The Section 42(i)(7) Statutory Minimum Price**

32.     In 1989, Congress added a safe harbor provision to Section 42 that is codified at 26 U.S.C. § 42(i)(7). Section 42(i)(7) authorizes owners of LIHTC properties to grant certain eligible stakeholders a right of first refusal ("ROFR") that allows the holder of the ROFR to buy the property, after the compliance period, for an amount not less than a minimum price that is unrelated to the fair market value of the property (the "statutory minimum price"). The ROFR holder (purchaser) is typically an affiliate of the general partner. If validly triggered, the ROFR

allows the ROFR holder to acquire the entire property and improvements that the partnership owns—in this case, the leasehold interest in the land and all improvements thereon. As a result, the investor limited partner is divested of its interests in the land and improvements but is guaranteed a tax neutral exit pursuant to the statutory minimum price.

33.     Section 42(i)(7) describes the statutory minimum price as follows:

> The minimum purchase price under this subparagraph is an amount equal to the sum of –
>
> (i)     The principal amount of outstanding indebtedness secured by the building (other than indebtedness incurred within the 5-year period ending on the date of the sale to the tenants), **and**
>
> (ii)    **All Federal, State, and local taxes attributable to such sale**.
> Except in the case of Federal income taxes, there shall not be taken into account under clause (ii) any additional tax attributable to the application of clause (ii).

(Emphasis added).

34.     This statutory minimum price, known in the industry as the "debt plus taxes" price, was put in place to protect the investor limited partner's investment by ensuring that, upon a sale of a LIHTC partnership's primary asset pursuant to a Section 42(i)(7) ROFR, the investor limited partner would receive a minimum distribution equal to their tax liability, plus the amount of any tax liability attributable to the minimum distribution, and therefore be made whole from a tax perspective.

35.     The Partnership is a pass-through tax entity that does not itself pay taxes. Accordingly, part (ii) of the statutory minimum price definition necessarily refers to the taxes (including Federal income taxes) that are incurred by the 99.99% investor limited partner upon a sale of the Partnership's primary asset (referred to colloquially in the industry as "Exit Taxes").

36.     On this point, the 2021 Novogradac LIHTC Year 15 Handbook states: "The statutory provisions permit the ROFR strike price to be equal to the principal amount of the

outstanding indebtedness secured by the building other than debt incurred within the prior five years, *plus exit taxes*, including all federal, state and local taxes that would be incurred by the limited partner that are attributable to the sale of the building." *2021 Novogradac LIHTC Year 15 Handbook* at 74 (emphasis added). Novogradac is a top accounting firm in the affordable housing space and their LIHTC handbook is considered the nation's leading authoritative guide to the LIHTC Program.

37.     That understanding of the Section 42(i)(7) ROFR was echoed in a report prepared for the U.S. Department of Housing and Urban Development, which described the accepted interpretation as follows: "Section 42 of the federal tax code provides the option for nonprofit sponsors to have a right of first refusal to purchase a LIHTC property at the end of the compliance period for a specified price, which includes the assumption of all outstanding debt, *plus payment of any investor exit taxes*." *What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?* (August 2012), at 31, n. 20, available at: https://www.huduser.gov/portal//publications/pdf/what_happens_lihtc_v2.pdf (emphasis added).

38.     The Developer's Guide to the Low Income Housing Tax Credit, published by the National Council of State Housing Agencies, similarly confirms that under the Section 42(i)(7) ROFR, "the nonprofit may have a right to purchase the project at the end of the compliance period for an amount equal to the sum of the outstanding indebtedness *and investor 'exit taxes.'*" *The Developer's Guide to the Low-Income Housing Tax Credit, Fourth Edition* (2020) at 85 (Library of Congress Card Number: 00-104730) (emphasis added).

39.     CohnReznick itself has likewise publicly recognized that the statutory minimum price under Section 42(i)(7) *must* include Exit Taxes that the LIHTC investor would incur in connection with the sale.

40.     In an article published in 2014, CohnReznick confirmed that Section 42(i)(7) "allows a qualified not-for-profit to purchase a project at the end of the compliance period for a purchase price equal to the sum of *the investor limited partner's exit taxes* plus the principal amounts of the outstanding indebtedness secured by the building." (Emphasis added).

41.     After confirming that the Section 42(i)(7) purchase price must include the investor limited partner's Exit Taxes, CohnReznick explained the relationship between the investor limited partner's capital account and its Exit Taxes:  "A back of the envelope method for calculating exit taxes is to take the investor limited partner's negative tax capital account and multiply it by the their [sic] marginal tax rate (combined federal and state) and then divide this amount by 1 minus their marginal tax rate."

42.     CohnReznick has never disavowed, disagreed with, modified, or qualified in any way any of the statements quoted above. To the contrary, as of the filing of this complaint, CohnReznick's 2014 article remains available on its website. *See* Year 15 Dispositions – Who Gets the Cash? (July 15, 2014), available at: https://www.cohnreznick.com/insights/year-15-dispositions-who-gets-cash (last visited February 8, 2023).

### D.     The Relationship Between a Limited Partner's Capital Account and the Section 42(i)(7) Statutory Minimum Price

#### a.     Capital Accounts and Minimum Gain

43.     A limited partner's capital account has special importance in the LIHTC context given the importance of ensuring that the allocations related to the tax credits and other tax benefits will be respected by the IRS as having "economic effect." CohnReznick's longstanding knowledge of and guidance regarding AMTAX's capital account is therefore critical for understanding why its conduct was so egregious here.

44.     At inception, a partner's capital account equals the amount of capital it contributed to the Partnership. Over time, the capital account will increase for any additional capital contributed and any net income or gain allocated to the partner and will decrease for any distributions made, and any losses and deductions allocated, to the partner.

45.     In the event a partner is allocated losses in excess of its capital contribution, its capital account can go below zero, resulting in a negative or deficit capital account, but *only if* (i) there is a deficit restoration obligation requiring the partner to restore their deficit (via a cash payment to the partnership in an amount necessary to bring its capital account to zero), or (ii) there is "Minimum Gain" under Section 1.704-2 of the Code in an amount sufficient to bring the deficit capital account to zero. The concept of Minimum Gain is therefore related to, and functions solely with respect to, the existence of a negative capital account.

46.     Section 1.704-2(b)(2) of the Treasury Regulations provides that, "[t]o the extent a nonrecourse liability exceeds the adjusted tax basis of the partnership property it encumbers, a disposition of that property will generate gain that at least equals that excess ('partnership minimum gain')." This is called Minimum Gain because it will be the minimum amount of gain realized upon a sale of the property *irrespective of the purchase price*.

47.     In the event there is insufficient revenue upon a sale to pay a nonrecourse liability, it will nonetheless trigger gain because "the amount realized from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition." *See* Treasury Regulation §1.1001-2.

48.     For example, assuming the adjusted tax basis of the property is $20 million and the nonrecourse liability is $30 million, a sale of that property at any price will generate gain in the minimum amount of $10 million. Assuming that the property sells for $20 million, the excess

nonrecourse liability over this amount will be deemed to have been discharged, resulting in

Minimum Gain in the form of "phantom income" totaling $10 million.

49.     As it relates to the Partnership, CohnReznick has served as the independent

auditor and tax preparer since AMTAX entered the Partnership in 2003. In those capacities,

CohnReznick provides various professional services, including, but not limited to, preparing

annual tax returns and audits for the Partnership, as well as preparing K-1 tax forms for AMTAX

and the Partnership's other partners. As part of these services, CohnReznick confirms capital

account balances and performs the Minimum Gain calculations.

50.     AMTAX's capital account has been growing more negative every year since

2010. As of December 31, 2021, AMTAX had a negative capital account balance of over $22

million.  AMTAX's negative capital account was carefully monitored by CohnReznick, who

confirmed annually—to AMTAX and to the IRS—that the Nonrecourse Debt generated

sufficient Minimum Gain (i.e., that AMTAX would be allocated sufficient gain upon sale of the

Property to increase AMTAX's negative capital account to zero).

51.     CohnReznick was able to annually make these confirmations because the

Nonrecourse Debt would either be paid or discharged (forgiven) upon a sale of the Property,

generating income—or phantom income—that would be allocated to AMTAX in an amount

necessary to bring its negative capital account to zero. CohnReznick was therefore fully aware

that the sale of the Property would likely trigger a tax liability to AMTAX.  This was important

because there is no deficit restoration obligation to restore the negative capital account and,

therefore, CohnReznick was relying solely on Minimum Gain to support AMTAX's negative

capital account.

b.  <u>Sale of the Property (Exit Taxes)</u>

52.    In the event the Section 42(i)(7) ROFR is validly triggered, it will result in a sale of 100% of the Partnership's interest in the Property, including its interest in the ground lease, to the GP Affiliate. This is a sale of substantially all the assets of the Partnership and constitutes a liquidating event under Treasury Regulation §1.704-1(b)(2)(ii)(g) and Section 2.5 of the Partnership Agreement.

53.    Given that AMTAX's negative capital account balance is supported by Minimum Gain, the sale of the Property will necessarily result in taxable gain, regardless of the purchase price, in an amount sufficient to bring AMTAX's capital account to zero. This taxable gain triggers the Exit Tax liability.

54.    The incurrence of the Exit Tax liability is contemporaneous with the sale and cannot be severed or de-coupled from it. The sale of the Property *is* the recognition event. This is required by the Code and the Treasury Regulations to prevent taxpayers from deferring, perhaps indefinitely, their obligation to pay taxes.

55.    The Exit Taxes would typically be borne by the party incurring such taxes. However, given that this is a non-market transaction, part (ii) of the Section 42(i)(7) statutory minimum price specifically requires the ROFR purchaser—i.e., the GP Affiliate—to pay the Exit Taxes as part of the statutory minimum price.

56.    The Exit Taxes are attributable to the sale of the Partnership's primary asset—i.e, the Property—regardless of when the Partnership is literally dissolved or when (or if) the investor limited partner formally "exits" the Partnership.

## II.     CohnReznick's Duties to AMTAX and Breach of Those Duties

57.     Beyond preparing the annual tax returns and audits, and in addition to preparing annual Minimum Gain confirmations to support AMTAX's growing negative capital account, CohnReznick was also asked several times to prepare a calculation of taxes that AMTAX would incur upon a sale of the Property, including in connection with a sale under Section 42(i)(7) (the "Exit Tax Calculations"). In response, CohnReznick ran a series of pro forma putative tax calculations for AMTAX to review and evaluate reflecting AMTAX's tax liability relating to the Minimum Gain on sale. This is a critical calculation because it represents the culmination of all the tax work CohnReznick has done since 2003, and is necessary to ensure that the tax benefits AMTAX received over the life of the Partnership would not be compromised.

58.     Moreover, in this situation—where the investor's negative capital account is so substantial that it has become a primary driver of the investor's economics—the accuracy and integrity of the Exit Tax Calculations took on even greater importance.

59.     Given CohnReznick's role, expertise, and history with this Partnership, AMTAX had a relationship of trust and confidence with CohnReznick. It relied on the firm to be honest, fair, and transparent regarding these critical Exit Tax Calculations, especially in light of CohnReznick's multiple years of representations to AMTAX and the IRS regarding the Minimum Gain that the Partnership would recognize upon a sale of the Property.

60.     As detailed below, CohnReznick performed three pro forma putative, and accurate, Exit Tax Calculations in 2017, 2018, and 2019. Each of these calculations represented the anticipated tax liability AMTAX would incur upon a sale of the Property and reflected the minimum amount AMTAX would receive under Section 42(i)(7)(ii).

61.     CohnReznick's secret engagement by the General Partner to perform a calculation that was *different* than the Exit Tax Calculations, that purposefully disregarded the Nonrecourse Debt and AMTAX's negative capital account, and that was done without notice to or consent by AMTAX, breached CohnReznick's duties to AMTAX, and conflicted with its role and work as the Partnership's independent accountant.

### A.     CohnReznick Owes Professional and Fiduciary Duties to AMTAX

62.     In connection with its role as the Partnership's accountant and tax preparer, CohnReznick owed duties to the partners of the Partnership—including AMTAX. As the American Institute of Certified Public Accountants ("AICPA") has explained, CohnReznick owes duties as a national accounting firm that extend beyond its clients. It has "a responsibility to the public", which includes "clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of members to maintain the orderly functioning of commerce."

63.     Given the tax-centric nature of LIHTC partnerships, the focus of CohnReznick's engagement was to protect the tax attributes of the Partnership, of which AMTAX is the 99.99% beneficiary. As such, CohnReznick has at all times been performing these services with the specific understanding that AMTAX would be relying on, and materially affected by, CohnReznick's work product.

64.     Beyond the professional duties that CohnReznick owes to AMTAX with respect to its standard accounting work in this context, CohnReznick assumed a heightened fiduciary duty to AMTAX with respect to the critical and highly consequential statutory minimum price calculation related to the GP Affiliate's exercise of its Section 42(i)(7) ROFR (the "ROFR

Calculation"), and the determination of AMTAX's taxes as part of that calculation, for the following reasons:

65.     *First*, CohnReznick had already performed three Exit Tax Calculations and had demonstrated on several occasions that it knew the proper method for determining "taxes attributable to [a] sale" of the Property. Those proper Exit Tax Calculations were consistent with the Code and all of the Minimum Gain calculations performed by CohnReznick. AMTAX reasonably relied on these calculations and was lulled into believing that CohnReznick would continue to provide impartial, independent, and accurate tax work to protect AMTAX's tax status or, at the very least, not abuse its position of trust to directly harm AMTAX for the benefit of another partner.

66.     *Second*, as CohnReznick was aware, the ROFR Calculation is a critical tax calculation that involves an understanding of the tax status of the Partnership and its partners, as well as several sections of the Code and the corresponding Treasury Regulations. Given the nature of the Nonrecourse Debt and AMTAX's large negative capital account, the ROFR Calculation was extremely consequential to AMTAX and had the potential to cause immense harm to AMTAX if CohnReznick did not get it right.

67.     *Third*, CohnReznick knew that the ROFR Calculation would impact one party—AMTAX. In fact, CohnReznick understood that any potential outcome was a zero-sum game given that every dollar that would not be paid to AMTAX would be retained by the General Partner (via its corporate parent, the GP Affiliate). Accordingly, CohnReznick's actions were done intentionally and with full awareness of the large and potentially negative impact they would have on AMTAX.

68.    *Finally*, CohnReznick has at all times been aware that any determinations it makes with respect to taxes, including the ROFR Calculation, would be accorded special weight because of its service as the auditor and tax preparer for the Partnership. In other words, CohnReznick knew that it would be an arbiter of any conflicts related to the ROFR Calculation.

### B.    Consistent with its Duties to AMTAX, CohnReznick Properly Performs the ROFR Calculation Three Times

69.    The first two Exit Tax Calculations that CohnReznick prepared in 2017 and 2018 were delivered to AMTAX and showed on their face that they were AMTAX's projected taxes upon a sale of the Property as of June 30, 2017 and June 1, 2018, respectively. As expected, these calculations were consistent with CohnReznick's prior Minimum Gain calculations and accurately reflected that AMTAX would receive gain upon a sale of the Property in an amount equal to its negative capital account balance, which gain would result in Exit Taxes to AMTAX of millions of dollars.

70.    The 2017 Exit Tax Calculation was included in a letter from the General Partner offering to purchase AMTAX's interests in the Partnership for its projected Exit Taxes upon a sale of the Property in the amount of $7,737,812. Attached hereto as **Exhibit 1** is a true and correct copy of the February 28, 2017 offer letter.

71.    The 2018 Exit Tax Calculation was revised in light of changes in the tax laws and an increase in AMTAX's negative capital account balance. This calculation was also included in a letter from the General Partner offering to purchase AMTAX's interests in the Partnership for its projected Exit Taxes upon a sale of the Property in the amount of $4,172,194. Attached hereto as **Exhibit 2** is a true and correct copy of the April 3, 2018 offer letter.

72.    In connection with a plan to trigger its corporate parent's Section 42(i)(7) ROFR, the General Partner requested that CohnReznick calculate the minimum statutory price that the

GP Affiliate would be required to pay to AMTAX in connection with a sale of the Property pursuant to the ROFR as of January 1, 2020.

73.     As a result, a third Exit Tax Calculation was prepared by CohnReznick in April 2019, which showed AMTAX's projected taxes upon a sale of the Property pursuant to the Section 42(i)(7) ROFR as of January 1, 2020. This calculation employed the same methodology used in the first two calculations and, once again, accurately reflected that AMTAX would receive gain upon a sale of the Property in an amount equal to its negative capital account balance (approximately $20 million), which gain would result in Exit Taxes to AMTAX of $5,382,990.

74.     With respect to the 2019 Exit Tax Calculation, discovery in another action has revealed that CohnReznick *knew* this was the correct methodology for calculating the statutory minimum price for a Section 42(i)(7) ROFR transaction. Indeed, a CohnReznick partner, Nick Ratti, confirmed in an email to the General Partner that $5,382,990 is "the payment due to the Investor when the ROFR is exercised." Another CohnReznick employee, Matt Romines, separately confirmed to the General Partner in writing that the calculated Exit Taxes represents the amount "that needs to be paid to the LP in cash" under Section 42(i)(7) of the Code.

75.     In this same email chain, the General Partner's experienced LIHTC counsel at the Klein Hornig law firm confirmed that it agreed with the 2019 Exit Tax Calculation under Section 42(i)(7) stating: "The basic approach in [Romines'] numbers and associated explanation looks correct." Attached hereto as **Exhibit 3** is a true and correct copy of this correspondence.

76.     Mr. Ratti was questioned in a separate action about the 2019 Exit Tax Calculation, and he admitted that the 2019 Exit Tax Calculation "specifically references a payment due to the investor when the ROFR is exercised." Accordingly, there can be no dispute that CohnReznick's

2019 Exit Tax Calculation reflected what would be owed to AMTAX if the GP Affiliate properly exercised the ROFR.

### C.     CohnReznick Violates Its Duties to AMTAX

77.     Even though all three of these Exit Tax Calculations were consistent, the 2019 Exit Tax Calculation was not provided to AMTAX, who only learned about this Exit Tax Calculation through discovery in a separate lawsuit.

78.     That was not an accident. Rather than providing the accurate 2019 Exit Tax Calculation to AMTAX, the General Partner and its consultants came up with a "strategy" to cheat AMTAX out of the multimillion-dollar payment of its Exit Taxes.

79.     In September 2019, representatives of the General Partner communicated by email regarding the General Partner's intention to force AMTAX out of the Partnership. The representatives acknowledged that the GP Affiliate had to pay "the existing debt + exit tax" in connection with its exercise of the Section 42(i)(7) ROFR. Nevertheless, they stated that "the *current strategy* is to go back to [Alden Torch] with $0 above assumption of existing debt," while acknowledging that the General Partner would "*most likely end up in court*" as a result of its pursuit of this strategy. (Emphasis added).

80.     Shortly thereafter, in furtherance of this "strategy," the General Partner and CohnReznick entered into a secret side engagement in January 2020, pursuant to which CohnReznick would provide a different calculation, this time excluding AMTAX's projected Exit Taxes upon a sale of the Property.

81.     Although CohnReznick had already determined "the payment due to the Investor when the ROFR is exercised" in connection with its April 2019 Exit Tax Calculation (*see* Exhibit 3), CohnReznick agreed in its January 17, 2020 engagement letter to "review the right of

first refusal, review the financials including the 2018 audit and the most recent monthly financial statement (November 2019), and calculate the right of first refusal price." That incongruity is telling. The fact that CohnReznick went into the engagement with the intention of revising its April 2019 Exit Tax Calculation (which was specifically a calculation of the statutory minimum price upon the exercise of the Section 42(i)(7) ROFR) demonstrates that it was intentionally violating duties owed to AMTAX.

82.     To be clear, it made no sense for CohnReznick to enter into a separate engagement agreement for the ROFR Calculation. The three Exit Tax Calculations CohnReznick had already performed *were* calculations of the Section 42(i)(7) ROFR price—i.e., the minimum price AMTAX would receive upon a sale of the Property if the Property were sold for no more than the debt. Indeed, CohnReznick *admitted in writing* that the 2019 Exit Tax Calculation "specifically references a payment due to the investor when the ROFR is exercised."

83.     Moreover, there is no difference between Exit Tax Calculations related to a sale of Partnership interests versus a sale of the Property. Section 2.5 of the Partnership Agreement specifies that the Partnership "shall be dissolved… upon the happening of… [t]he sale or other disposition of all or substantially all of the assets of the Partnership." The Exit Taxes, as well as everything that occurs after the sale of the Partnership's primary asset, are attributable to the sale of such asset regardless of *when* the Partnership is literally dissolved or when (or if) the investor limited partner formally "exits" the Partnership. The Code and the Partnership Agreement are clear that the sale of substantially all of the Partnership's assets—in this case, the Property— constitutes a liquidating event with respect to the Partnership *even though* the Partnership may continue in existence for the purpose of winding up its affairs. *See* Treasury Regulation §1.704-1(b)(2)(ii)(g).

84.     This side agreement was also a blatant conflict of interest and, at a minimum, CohnReznick was obligated to disclose the General Partner's request to AMTAX and to obtain AMTAX's consent to the engagement. As the AICPA has explained, there are duties that arise when accountants encounter a conflict of interest:

> When a conflict of interest exists, the member should disclose the nature of the conflict of interest to clients and other appropriate parties affected by the conflict and obtain their consent to perform the professional services. The member should disclose the conflict of interest and obtain consent even if the member concludes that threats are at an acceptable level.

85.     On or about February 7, 2020, Mr. Ratti—i.e., the same CohnReznick partner who had previously confirmed that AMTAX would need to be paid its Exit Taxes "when the ROFR is exercised"—provided the General Partner with a "Right of First Refusal Calculation" that did not include any amounts attributable to AMTAX's Exit Taxes (the "Sham ROFR Calculation").

86.     This Sham ROFR Calculation did not indicate that CohnReznick had performed the calculation, and that fact remained unknown to AMTAX until it was discovered through a separate lawsuit.

87.     CohnReznick knew that this Sham ROFR Calculation would be sent to one party – AMTAX – and would be relied upon by the General Partner to cheat AMTAX out of, and keep for itself (via the GP Affiliate), the millions of dollars that are owed to AMTAX under part (ii) of Section 42(i)(7), *i.e.*, its Exit Taxes upon a sale of the Property. Indeed, the Sham ROFR Calculation was integral to the General Partner's "strategy… to go back to [AMTAX] with $0 above assumption of existing debt"—thus shifting millions of dollars from AMTAX to the General Partner.

88.     CohnReznick's new and nonsensical determination that there are zero "taxes attributable to sale" completely ignores AMTAX's negative capital account and the Nonrecourse Debt, and is irreconcilable with the Code, its own prior positions—both publicly and via its first three Exit Tax Calculations—as to how the Section 42(i)(7) purchase price is calculated, and over a decade of Minimum Gain calculations performed by CohnReznick for the benefit of AMTAX.

89.     More specifically, the Minimum Gain calculations confirmed that there would be gain upon a sale of the Property *in the minimum amount* of AMTAX's negative capital account based on the inclusion of Nonrecourse Debt, while the Sham ROFR Calculation reflects a *loss* of $1.8 million upon a sale of the Property and completely ignores the Nonrecourse Debt and the required gain on sale. Manipulating the timing of the discharge of the Nonrecourse Debt by attempting to "de-couple" it from the sale of the Property—for the sole purpose of getting the Exit Taxes to zero—reflects the intentional and, at a minimum, reckless nature of CohnReznick's actions with respect to the Sham ROFR Calculation.

90.     Mr. Ratti was questioned under oath as to how the Sham ROFR Calculation he performed could be reconciled with the Minimum Gain calculations that CohnReznick had performed since 2010, and that it had diligently reported to AMTAX and the IRS. He testified that he was "not aware" of these Minimum Gain calculations. While Mr. Ratti was aware that Minimum Gain was necessary to allow AMTAX's capital account to go negative, he claimed that he "did not dig into the reason as to why the capital account had gone so negative."

91.     The see no evil, hear no evil, speak no evil approach reflected in Mr. Ratti's testimony is not credible coming from an accounting firm like CohnReznick, which holds itself out as highly sophisticated with respect to the affordable housing industry. That is particularly

true because Mr. Ratti testified that he had his work checked by CohnReznick's National Affordable Housing practice leader, Beth Mullen.

92.     CohnReznick failed to exercise the skill, knowledge, and judgment generally possessed by members of the accounting profession by agreeing to the General Partner's request to provide a Sham ROFR Calculation that disregards relevant facts and law that, when taken together, *require* the discharge of the Nonrecourse Debt to be taken into consideration upon the sale of the Property, and not at some artificial "later" date.

93.     Most importantly, CohnReznick's intentional and reckless conduct violated its professional and fiduciary duties and its past representations of impartiality and independence by actively endorsing a position that it knew was incorrect in order to advance the interests of the General Partner to the detriment of AMTAX.

> **D.     AMTAX's Discovery of CohnReznick's Sham ROFR Calculation and the Resulting Harm**

94.     On February 10, 2020—just one business day after CohnReznick betrayed AMTAX's trust and its own independence by intentionally providing the false and misleading Sham ROFR Calculation—the General Partner sent a "Disposition Notice" to the GP Affiliate. The Disposition Notice informed the GP Affiliate that it had the right for the next 30 days to purchase the Property for $17,108,380—i.e., an amount equal to the outstanding debt secured by the Property but excluding AMTAX's Exit Taxes—pursuant to its Section 42(i)(7) ROFR, and attached CohnReznick's Sham ROFR Calculation.

95.     As detailed above, the Sham ROFR Calculation did not include Exit Taxes and is therefore below the statutory minimum price (also known as the "debt plus taxes" price) required under Section 42(i)(7).

96.     On or about February 11, 2020, the GP Affiliate sent a Purchase Notice to the Partnership purporting to exercise its Section 42(i)(7) ROFR to purchase the Property for $17,108,380.

97.     The General Partner's false claim that the purchase price under the ROFR does not include AMTAX's Exit Taxes was the direct result of CohnReznick's agreeing to provide the false and misleading Sham ROFR Calculation.

98.     Soon after receiving notice of the GP Affiliate's purported exercise of its Section 42(i)(7) ROFR, AMTAX notified the General Partner that it objected to a sale of the Property at the price that—unbeknownst to AMTAX—CohnReznick had secretly calculated.

99.     The General Partner and GP Affiliate subsequently filed a lawsuit in Massachusetts state court against AMTAX, among others (the "Massachusetts Action") seeking, *inter alia*, a declaration that the Partnership is obligated to sell the Property to the GP Affiliate for the incorrect purchase price of $17,108,380—i.e., an amount that excludes AMTAX's Exit Taxes.

100.    But for CohnReznick's misguided Sham ROFR Calculation, AMTAX would not have had to seek to set aside that calculation in the Massachusetts Action, and the action itself almost certainly would not have been filed. In other words, CohnReznick's misconduct proximately caused AMTAX to incur hundreds of thousands of dollars in legal fees.

101.    In fact, AMTAX has paid over $500,000 in legal fees and costs and continues to incur significant additional legal fees and costs in the Massachusetts Action as a direct and proximate result of CohnReznick's egregious misconduct.

102.    Even after the General Partner brought the Massachusetts Action seeking to enforce the Sham ROFR Calculation against AMTAX, CohnReznick still failed to inform AMTAX of its role in providing the Sham ROFR Calculation to the General Partner.

103.    While CohnReznick's anonymized work product was initially successful in concealing its role in the underlying scheme, AMTAX learned in discovery that CohnReznick created the Sham ROFR Calculation.

104.    Soon after learning that CohnReznick was responsible for the Sham ROFR Calculation on which the General Partner and GP Affiliate are relying in the Massachusetts Action, AMTAX sent a letter to CohnReznick on October 21, 2022.

105.    AMTAX's letter noted that CohnReznick's Sham ROFR Calculation conflicted with its prior calculations, failed to account for AMTAX's Exit Taxes in violation of Section 42(i)(7) and contrary to CohnReznick's own public statements, and was incompatible with CohnReznick's Minimum Gain calculations.

106.    AMTAX further explained that:

As the accountants for the Partnership, CohnReznick owes an obligation to the Partnership's partners to provide accurate, unbiased, and contextually appropriate tax reporting and advice, and not to act on behalf of a single partner to the detriment of the Partnership or another partner.  Yet the 'exit tax' calculation CohnReznick prepared for litigation purposes, and its actions surrounding the preparation of that calculation, show a reckless disregard of these standards and duties.

107.    AMTAX concluded the letter by requesting that CohnReznick confirm that the Sham ROFR Calculation did not properly account for AMTAX's Exit Taxes, and that CohnReznick's prior calculations (discussed above) follow the correct methodology for calculating Exit Taxes that would be due upon a sale of the Property pursuant to the ROFR.

108.    CohnReznick's National Affordable Housing practice leader, Beth Mullen, responded to AMTAX's letter on November 2, 2022. In her response, Ms. Mullen confirmed that CohnReznick's Sham ROFR Calculation purported to reflect "the minimum purchase price as defined in Internal Revenue Code Section 42(i)(7)," but failed to include AMTAX's Exit Taxes.

109.    Nevertheless, Ms. Mullen refused to attempt to reconcile CohnReznick's Sham ROFR Calculation with its prior public acknowledgment that Section 42(i)(7) "allows a qualified not-for-profit to purchase a project at the end of the compliance period for a purchase price equal to the sum of *the investor limited partner's exit taxes* plus the principal amounts of the outstanding indebtedness secured by the building." (Emphasis added). Instead, she claimed that the pending litigation prevented her from providing any further justification for the faulty calculation.

110.    In hindsight, Ms. Mullen's glib response is hardly surprising. CohnReznick has chosen to become a partisan supporter of LIHTC general partners to the detriment of investors like AMTAX. Having made a calculated decision to cast its lot with a certain subset of the industry, CohnReznick had nothing more to say once AMTAX discovered that CohnReznick had performed the sham calculation for the benefit and at the direction of the General Partner.

111.    As a direct result of CohnReznick's misconduct and misrepresentations, AMTAX has sustained millions of dollars in damages, including, but not limited to, more than $500,000 in legal fees and costs that AMTAX has incurred and continues to incur in the Massachusetts Action and that are recoverable under the wrong-of-another doctrine, and at least $8.5 million in Exit Taxes that AMTAX is entitled to receive upon a sale of the Property but that the GP Affiliate has refused to pay in reliance on the Sham ROFR Calculation performed by CohnReznick.

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty

112.   AMTAX incorporates by reference each of the preceding paragraphs as though fully set forth herein.

113.   CohnReznick provides various professional services as the Partnership's accountant and auditor, including but not limited to preparing and filing annual tax returns for the Partnership, as well as preparing K-1 tax forms for AMTAX and the Partnership's other partners.

114.   CohnReznick has at all relevant times been fully aware that AMTAX relied on CohnReznick to provide accurate and independent advice regarding all tax matters involving the Partnership, including, but not limited to, the impact of AMTAX's negative capital account on its tax liability in connection with a sale of the Property.

115.   In light of how substantial AMTAX's negative capital account had become, CohnReznick also understood that the calculation of AMTAX's Exit Taxes was a crucial and highly consequential calculation because it was necessary to ensure that the tax benefits AMTAX received over the life of the Partnership would not be materially compromised.

116.   Moreover, in its capacity as the Partnership's accountant, CohnReznick worked directly and in depth with AMTAX's representatives to confirm for more than a decade that the taxable loss allocations that resulted in AMTAX's large negative capital account were permissible under the Code because of the Minimum Gain that would be allocated to AMTAX upon a sale of the Property.

117.   CohnReznick accordingly owed, assumed, or undertook a fiduciary duty to AMTAX to avoid taking positions that (1) conflicted with the methodology CohnReznick used

in performing Minimum Gain calculations and prior Exit Tax Calculations; (2) jeopardized the tax attributes of the Partnership; and (3) deliberately sought to prevent AMTAX from receiving all the tax benefits and other benefits it was promised and to which it is statutorily and contractually entitled.  CohnReznick's duty included a general obligation to provide independent and reliable tax advice in connection with AMTAX's investment in—and exit from—the Partnership, as well as a specific responsibility to provide an accurate ROFR Calculation that included AMTAX's Exit Taxes

118.    CohnReznick breached its fiduciary duty by entering into a secret agreement to provide a calculation of the Section 42(i)(7) purchase price in connection with the GP Affiliate's purported exercise of its ROFR that CohnReznick knew was inconsistent with federal tax law, would imperil the Partnership's tax treatment, and would prevent AMTAX from receiving all the tax benefits and other benefits it was promised and to which it is entitled.

119.    CohnReznick knew that (a) the General Partner would rely on CohnReznick's improper calculation to argue that the GP Affiliate did not need to pay AMTAX its Exit Taxes in connection with a sale of the Property pursuant to the Section 42(i)(7) ROFR, and (b) that its calculation would carry special weight due to its position of trust and authority as the Partnership's independent auditor and tax preparer.

120.    CohnReznick also knew that if it performed a calculation to support the General Partner's position, this would result in litigation for AMTAX.  That consequence was reasonably foreseeable since AMTAX could only set aside CohnReznick's improper calculation through a legal declaration of its rights in a court of law.

121.    AMTAX has been damaged as a direct and proximate result of CohnReznick's breach of its fiduciary duty in an amount to be determined at trial.

## COUNT II
## Professional Negligence

122.    AMTAX incorporates by reference each of the preceding paragraphs as though fully set forth herein.

123.    CohnReznick is the Partnership's accountant and auditor.

124.    The end and aim of the tax advice and services CohnReznick provides as the Partnership's accountant is for the benefit of AMTAX in its capacity as the Partnership's investor limited partner and 99.99% owner.

125.    CohnReznick was engaged for the specific purpose of advancing AMTAX's interests in receiving reliable and impartial tax advice.

126.    CohnReznick understood that the calculation of AMTAX's Exit Taxes is critically important because it represents the culmination of all the tax work CohnReznick has done since 2003, and it is necessary to ensure that the tax benefits AMTAX received over the life of the Partnership would not be compromised.

127.    In calculating the Section 42(i)(7) purchase price, CohnReznick owed AMTAX a professional duty of care to exercise the skill, knowledge, and judgment generally possessed by accountants.

128.    CohnReznick knowingly entered an agreement with the General Partner on behalf of the Partnership to calculate the Section 42(i)(7) purchase price in connection with the GP Affiliate's exercise of its ROFR.

129.    CohnReznick knew that (a) the General Partner would rely on CohnReznick's calculation to argue that the GP Affiliate did not need to pay AMTAX its Exit Taxes in connection with a sale of the Property pursuant to the Section 42(i)(7) ROFR, and (b) that its

calculation would carry special weight due to its position of trust and authority as the Partnership's independent auditor and tax preparer.

130.    CohnReznick also knew that if it negligently performed a calculation to support the GP Affiliate's position, this would result in litigation for AMTAX. That consequence was reasonably foreseeable since AMTAX could only set aside CohnReznick's improper calculation through a legal declaration of its rights in a court of law.

131.    CohnReznick breached its duty to AMTAX to exercise the skill, knowledge, and judgment generally possessed by members of the accounting profession by providing the General Partner a calculation of the Section 42(i)(7) ROFR price that did not include the millions of dollars in Exit Taxes that AMTAX would incur upon a sale of the Property.

132.    CohnReznick prevented AMTAX from discovering its breach of its professional duties by wrongfully failing to disclose that it had been retained to perform the Section 42(i)(7) calculation and by omitting any reference to the firm in the calculation itself. This was done for the purpose of concealing CohnReznick's conduct and related conflict of interest from AMTAX.

133.    Despite AMTAX diligent efforts, it was unable to discover CohnReznick's professional negligence until discovery during the Massachusetts Action. Once it discovered the misconduct, AMTAX promptly acted to protect its rights.

134.    AMTAX has been damaged as a direct and proximate result of CohnReznick breach of its professional duty in an amount to be proven at trial.

### COUNT III
### Fraud

135.    AMTAX incorporates by reference each of the preceding paragraphs as though fully set forth herein.

136.    CohnReznick is the Partnership's accountant.

137.     The end and aim of the tax advice and services CohnReznick provides as the Partnership's accountant is for the benefit of AMTAX in its capacity as the Partnership's investor limited partner and 99.99% owner.

138.     CohnReznick was engaged for the specific purpose of advancing AMTAX's interests in receiving reliable and impartial tax advice.

139.     Moreover, through its statements, actions, and role as the Partnership's accountant, CohnReznick communicated to AMTAX that it would provide impartial and independent advice to protect AMTAX's tax status, and AMTAX reasonably relied on those representations in, among other things, incurring a significant negative capital account balance and continuing to permit CohnReznick to serve as the Partnership's accountant.

140.     At a point prior to the January 17, 2020 secret engagement letter concealed from AMTAX, CohnReznick began working at the behest of the General Partner and against the interests of AMTAX.  CohnReznick fraudulently failed to disclose that conflict of interest despite its past representations of independence, its duties to AMTAX, and its obligations under the relevant professional guidelines. CohnReznick did so intentionally and to avoid damaging its relationship with AMTAX and Alden Torch.

141.     AMTAX has been damaged as a direct and proximate result of CohnReznick's fraud in an amount to be determined at trial.

**COUNT IV**
**Unjust Enrichment**

142.     AMTAX incorporates by reference each of the preceding paragraphs as though fully set forth herein.

143.     CohnReznick received a benefit at AMTAX's expense by virtue of the compensation it received from the secret agreement it entered into with the General Partner to

provide a calculation of the Section 42(i)(7) purchase price, which is part of a scheme by the accounting firm to ingratiate itself to the low-income housing nonprofit community and distinguish itself from its more principled competitors.

144.   CohenReznick's conduct disadvantaged AMTAX because the General Partner relied on CohnReznick's improper calculation to argue that the GP Affiliate did not need to pay AMTAX its Exit Taxes in connection with a sale of the Property pursuant to the Section 42(i)(7) ROFR.

145.   It would be unjust for CohnReznick to retain the benefits it received without appropriate compensation to AMTAX. In particular, it would be unjust because CohnReznick's improper calculation of the Section 42(i)(7) purchase price (1) conflicted with the methodology CohnReznick used in performing Minimum Gain calculations and prior Exit Tax Calculations; (2) jeopardized the tax attributes of the Partnership; and (3) deliberately sought to prevent AMTAX from receiving all the tax benefits and other benefits it was promised and to which it is statutorily and contractually entitled.

**DEMAND FOR RELIEF**

WHEREFORE, AMTAX prays for relief and judgment, including:

a.   awarding damages in favor of AMTAX and against CohnReznick sustained as a result of CohnReznick's wrongdoing in an amount to be proven at trial, including but not limited to (1) more than $500,000 in legal fees and costs that AMTAX has incurred and continues to incur in the Massachusetts Action filed by the General Partner and the GP Affiliate, and (2) at least $8.5 million in Exit Taxes that AMTAX is entitled to receive upon a sale of the Property pursuant to the Section 42(i)(7) ROFR based on its current capital account;

b.      disgorgement of CohnReznick's ill-gotten gains, including any fees it has received from the General Partner and any other similarly situated parties in the LIHTC industry for performing calculations that the firm willfully computed at odds with Section 42(i)(7);

c.      compensation for CohnReznick's unjust enrichment at AMTAX's expense;

d.      punitive damages in favor of AMTAX and against CohnReznick as a result of CohnReznick's deliberate and intentional wrongdoing;

e.      reimbursement of AMTAX's costs and expenses incurred in this action, including reasonable attorneys' fees;

f.      pre-judgment and post-judgment interest; and

g.      such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Dated: February 9, 2023
New York, New York

By:   _/s/ L. Reid Skibell_
      GLENN AGRE BERGMAN & FUENTES LLP

      L. Reid Skibell, Esq.
      Olga Lucia Fuentes Skinner, Esq.
      Avelino A. Garcia, Esq.

      1185 Avenue of the Americas
      New York, New York 10036
      Tel: (212) 970-1600

      _Counsel for AMTAX Holdings 227, LLC_