UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
AMTAX HOLDINGS 227, LLC,

              Plaintiff,

      - against –

COHNREZNICK LLP,

              Defendant.

------------------------------X

**MEMORANDUM AND ORDER**

23 Civ. 1124 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff AMTAX Holdings 227, LLC ("AMTAX," the "Limited Partner," or "plaintiff") filed this lawsuit on February 9, 2023 asserting claims of breach of fiduciary duty, professional negligence, unjust enrichment, and fraud against CohnReznick LLP ("CohnReznick" or "defendant").  Presently before the Court is defendant's motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 33.  Also pending before the Court is nonparty Tenants' Development Corporation's (the "Nonprofit" or "TDC") motion to intervene and dismiss pursuant to Federal Rules of Civil Procedure 24, 12(b)(1), and 12(b)(6).  ECF No. 35.  For the following reasons, defendant's motion is granted and the complaint is dismissed for lack of subject matter jurisdiction.  Consequently, the Court does not need to reach the motion to intervene.

BACKGROUND[1]

Plaintiff's claims stem from its investment in a limited partnership that owned a low-income housing property located in Boston, Massachusetts (the "Property").  The limited partnership owned the Property pursuant to the Low-Income Housing Tax Credit ("LIHTC") program in order to take advantage of certain tax benefits.  Before addressing the specific facts of this case, it is helpful at the outset to provide some background regarding the LIHTC program.

A.    The LIHTC Program

Congress created the LIHTC program pursuant to the Tax Reform Act of 1986 as an incentive to private investors to finance the development of affordable housing through the distribution of tax credits.  See generally Mark P. Keightley, CONG. RSCH. SERV., RS22389, An Introduction to the Low-Income Housing Tax Credit (2023).  Through the LIHTC program, the Internal Revenue Service ("IRS") allocates federal tax credits annually to state housing agencies, which then award the tax credits to eligible developers

---

[1] The facts considered and recited here are drawn from plaintiff's complaint and any attachments thereto, and are accepted as true for purposes of the instant motion.  See Doe v. City of New York, No. 19 Civ. 9338 (AT), 2021 WL 964818, at *1 (S.D.N.Y. Mar. 15, 2021).  The Court also refers to documents attached to defendant's motion to dismiss and to plaintiff's opposition.  See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (stating that a district court resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "may refer to evidence outside the pleadings").

to offset the costs of construction in exchange for reserving a portion of the units for affordable housing.  See id. at 3-4; SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc., 33 F.4th 872, 874 (6th Cir. 2022).

In order to obtain financing for LIHTIC-qualifying housing developments, developers -- many of which are nonprofit organizations -- frequently allocate the tax credits attributable to the development to outside private investors. Keightley, supra 2, at 5-6.  Typically, the developers and investors structure the sale through a limited partnership, with the nonprofit developers serving as the general partner, owning a small percentage of the property while managing the development on a day-to-day basis, and the investor serving as the limited partner, owning the vast majority of the development but playing an otherwise passive role. Id.

To qualify for the tax credits, owners of eligible projects must report on their compliance with the LIHTC leasing requirements annually for fifteen years, which is called the "compliance period." Compl. ¶ 26.  As long as a project adheres to certain rent affordability restrictions for the compliance period, the private investor may claim tax credits annually over a ten-year period. Keightley, supra 2, at 1.  Once the compliance period has

-3-

ended, the annual tax credits are no longer available.  See id.;
26 U.S.C. § 42(j)(1).  At this point, investor limited partners
typically exit the limited partnership because "the benefits are
both gone and safeguarded, because the IRS will no longer seek
recapture of prior tax benefits, even if the properties fall out
of compliance with LIHTC income limits or other requirements."
U.S. Dep't of Hous. and Urb. Dev., What Happens to Low-Income
Housing Tax Credit Properties at Year 15 and Beyond? 29 (Aug.
2012),
https://www.huduser.gov/portal//publications/pdf/what_happens_li
htc_v2.pdf ("HUD Report").

     As a result, once the compliance period ends, there is
generally a risk that LIHTC developments transition away from
operating as affordable housing.  For this reason, 26 U.S.C.
§ 42(i)(7) ("Section 42(i)(7)") was enacted to encourage the
continued availability of affordable housing by providing a safe
harbor that protects investor limited partners from suffering
negative tax consequences when they sell the developments to
qualifying nonprofits at a below-market price.[2]  26 U.S.C. §§

---

[2] Section 42(i)(7)(A) provides that "[n]o Federal income tax benefit shall fail
to be allowable to the taxpayer with respect to any qualified low-income
building merely by reason of a right of 1st refusal held by . . . a qualified
nonprofit organization (as defined in subsection (h)(5)(C)) . . . to purchase
the property after the close of the compliance period for a price which is not

42(i)(7), (h)(5).  Generally, the IRS treats below-market purchase options as conditional transfers of ownership to the option-holder, <u>see</u> Rev. Rul. 55-540, 1955-2 C.B. 39, § 4.01(e), which precludes owners whose interests are subject to such a right from claiming any tax benefits associated with the asset.  However, under Section 42(i)(7)'s safe harbor, this general rule is inapplicable to qualifying sales.  Specifically, Section 42(i)(7) allows the limited partner to grant qualifying nonprofits, among others, a right of first refusal that can be exercised at the end of the compliance period.  In order to qualify for the safe harbor, the price at which the nonprofit can exercise its right of first refusal must satisfy the minimum purchase price set forth under Section 47(i)(7)(B).[3]

---

less than the minimum purchase price determined under subparagraph (B)."  26 U.S.C. § 42(i)(7).

[3] The minimum purchase price allowable to qualify for the Section 42(i)(7) safe harbor is:

> [A]n amount equal to the sum of—
>
> (i)   the principal amount of outstanding indebtedness secured by the building (other than indebtedness incurred within the 5-year period ending on the date of the sale to the tenants), and
>
> (ii)  all Federal, State, and local taxes attributable to such sale.
>
> Except in the case of Federal income taxes, there shall not be taken into account under clause (ii) any additional tax attributable to the application of clause (ii).

26 U.S.C. § 42(i)(7)(B).

If the parties choose to take advantage of this optional safe harbor, the parties must negotiate the specific terms and conditions of that right of first refusal -- which can vary widely -- in a contract. See Compl. ¶ 37; HUD Report at 30-32 (explaining how and why the terms and conditions of a limited partner's exit process may vary depending on the context). Typically, the right of first refusal is granted via the initial partnership agreement. HUD Report at 31 n. 20. Once the right has been triggered in accordance with the contract, the party holding the right of first refusal can elect to purchase the LIHTC development for the agreed upon purchase price. However, in order to qualify for the safe harbor, that price cannot be less than the minimum purchase price required by Section 47(i)(7)(B)). Id.

## B.  The Tenants' Development II Partnership

In the early 2000s,[4] a limited partnership, Tenants' Development II, L.P. (the "Partnership"), was formed to redevelop and own a 185-unit affordable housing development in Boston, Massachusetts pursuant to the LIHTC program. Compl. ¶¶ 9, 20. Tenants' Development II Corporation (the "General Partner"), an

---

[4] Plaintiff alleges that the partnership was formed in 2003, however, related litigation indicates that the partnership was formed in 2002. See AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp., 15 F.4th 551, 553 (1st Cir. 2021); Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, CA No. 2084 Civ. 01260-BLS1, at 4 (Mass. Super. Ct.).

affiliate of TDC, the Nonprofit, serves as the general partner of the Partnership and owns 0.009% of the Partnership's interests. Id. ¶¶ 14, 15.  In exchange for a $12 million capital contribution, AMTAX received a 99.99% ownership stake in the Partnership and the right to tax credits generated by the Property.[5]  Id. ¶ 22. According to the motion papers, Alden Torch Financial LLC ("Alden Torch"), an investment management company, acquired AMTAX in 2011 and has managed AMTAX's interest in the Partnership since that time.  ECF No. 33-10 ("Mot.") at 4-5; ECF No. 36 at 6; Compl. ¶ 11.  Meanwhile, defendant CohnReznick has served as the Partnership's auditor and tax preparer for "approximately twenty years."  Id. ¶ 1.

The Partnership and the Nonprofit had entered into a right of refusal and purchase option agreement on June 20, 2003.  Id. ¶ 20; ECF No. 33-3 ("ROR Agreement").  Under this agreement, the Partnership granted the Nonprofit the right to purchase the property "in the event [the Partnership] proposes to sell, transfer, assign, or ground lease all or substantially all [the Partnership's] interest" for:

---

[5] The remaining 0.001% of the Partnership is owned by non-party Tax Credit Holdings III, LLC (together with AMTAX, the "Limited Partners"), a special limited partner that is managed by Alden Torch Financial LLC, the same investment management company that owns AMTAX.  Compl. ¶ 11, 13; Mot. at 4-5.

-7-

lesser of:

> (x) the price stated in the Disposition Notice, or

> (y) the sum of the principal amount of outstanding indebtedness secured by the Property (other than indebtedness incurred within the 5-year period ending on the date of any sale to the Sponsor) and all federal, state and local taxes attributable to such sale.

Id. §§ 2(a), (b)(ii).

On February 28, 2017, and again on April 3, 2018, the Nonprofit sent letters to AMTAX offering to purchase its interest in the Property ahead of the end of the compliance period on December 31, 2018 pursuant to Section 7.4(J) of the parties' limited partnership agreement. ECF Nos. 1-1, 1-2, 36-4. Each of these letters included a calculation performed by CohnReznick indicating the Nonprofit's proposed purchase price of $7,737,812 and $4,172,194, respectively. ECF Nos. 1-1, 1-2. According to the letters, these prices represented the "the anticipated tax liability incurred in the event of a sale of the Project, plus the amount of any tax liability attributable to the Exit Tax Distribution[6]." Id. However, the parties failed to negotiate an

---

[6] "Exit Tax Distribution" is defined in the parties' limited partnership agreement as a "priority distribution . . . in an amount equal to its tax liability incurred by the sale, plus the amount of any tax liability

early exit of the Limited Partners after disputing the existence and scope of the Nonprofit's right of first refusal.  ECF No. 33-2 (Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, CA No. 2084CV01260-BLS1 (Mass. Super. Ct. 2020) (the "Massachusetts Action"), Doc No. 62 (the "Massachusetts Decision")) at 6-8; see also Compl. ¶¶ 69-71.

On January 17, 2020, the Partnership engaged CohnReznick to calculate the price at which the Nonprofit could exercise its right of first refusal.  Compl. ¶ 81.  On February 10, 2020, the Partnership and the General Partner informed the Nonprofit of its intention to sell the Property to a third party, triggering the Nonprofit's right of first refusal.  Compl. ¶ 94; ECF 33-5 (the "Disposition Notice").  Attached to the Disposition Notice was a calculation performed by CohnReznick of the right of first refusal price, totaling $17,108,380 (the "Purchase Price"), which included zero "taxes attributable to the sale" of the Property, i.e. exit taxes.  Id.; Compl. ¶ 3.  The next day, the Nonprofit notified the Partnership that it planned to purchase the property for the amount stated in the Disposition Notice.  Compl. ¶ 96.

---

attributable to the Exit Tax Distribution taking into account any charitable donation in connection with such sale," to be paid "in the event of a sale to a qualified non-profit entity pursuant to the LURA or tax credit reservation." ECF No. 36-4 § 6.1(B).

AMTAX objected to the sale, claiming that its consent was required in order to exercise the right of first refusal.[7]  Id. ¶ 98; Mot. at 6.  As explained below, litigation ensued.  Today, the sale of the Property to the Nonprofit has not been completed.

## C.  The Federal Court Litigation

On May 12, 2020, the Nonprofit and the General Partner filed an action against AMTAX in the District of Massachusetts, asserting diversity jurisdiction and seeking, among other things, a declaratory judgment that the right of first refusal had been validly triggered and exercised at the price calculated by CohnReznick.  Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, No. 20 Civ. 10902 (LTS) (D. Mass. May 12, 2020), ECF No. 1 ¶¶ 112-13, 151.  Shortly thereafter, AMTAX disclosed in a motion to dismiss that one member of its owner, Alden Torch, was a Massachusetts citizen, as were the Nonprofit and the General Partner, thereby destroying diversity jurisdiction.  Id., ECF No. 13.

Also on May 12, 2020, AMTAX filed a complaint, also in the District of Massachusetts, against the Nonprofit and the General Partner, seeking a declaration that the ROR Agreement did not

---

[7] According to the Massachusetts Decision, in an attempt to prevent the Nonprofit from exercising its right of first refusal, AMTAX recorded a "Notice of Consent Rights" at the Suffolk Registry of Deeds, which stated that any transfers of title require AMTAX's consent.  Massachusetts Decision at 7.  As a result of this notice, MassHousing "halted its final approval of the sale" to the Nonprofit.  Id. at 8.

comply with Section 42(i)(7), that the Nonprofit's exercise of the right was invalid, and that the ROR agreement was therefore void. AMTAX Holdings 227, LLC v. Tenants' Dev. Corp., No. 20 Civ. 10911 (D. Mass. May 12, 2020), ECF No. 1 (the "Federal Massachusetts Action").  In the alternative, AMTAX sought a declaration that the purchase price had been calculated incorrectly and that it was entitled to an exit tax distribution.  AMTAX also brought various state-law claims, including claims for fraud, breach of contract, and breach of fiduciary duties.  It argued that the district court had subject matter jurisdiction because the allegations concerned the meaning of the term "right of 1st refusal" in Section 42 and required the court to resolve whether the ROR Agreement violated Section 42.

On December 23, 2020, the district court dismissed both of these actions for lack of subject matter jurisdiction.  Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC, No. 20 Civ. 10902 (LTS), No. 20 Civ. 10911 (LTS), 2020 WL 7646934, at *1 (D. Mass. Dec. 23, 2020), aff'd on other grounds sub nom. AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp., 15 F.4th 551 (1st Cir. 2021).  The United States Court of Appeals for the First Circuit affirmed the district court's decision, concluding that "[r]efined to bare essence, this [was] a dispute over a contract, the [ROR] Agreement," not an

important federal question concerning the interpretation of Section 42(i)(7).  <u>AMTAX Holdings 227, LLC</u>, 15 F.4th at 557. First, the court held that Section 42 was not necessarily raised, as nothing in the statute suggests that noncompliance would void an existing right of first refusal agreement; instead, noncompliance would merely result in the unavailability of the safe harbor.  <u>Id.</u>  Specifically, the First Circuit found that:

> Section 42(i)(7) provides only that "no Federal income tax credit shall fail to be allowable" when a qualifying right of first refusal is in effect. Nothing in the statute either suggests or implies that it voids noncompliant right of first refusal agreements. The notion that section 42(i)(7) independently voids noncompliant agreements rather than simply making a party or a project ineligible for certain tax benefits borders on the specious and seems too thin a reed to support federal jurisdiction.

<u>Id.</u>

Second, the First Circuit found that AMTAX's claims were not substantial enough to support federal question jurisdiction. While observing that the "common thread that runs through" state-law claims that implicate substantial federal issues is the presence of "some appreciable measure of risk to the federal sovereign," the court found that this case "involve[d] no such jeopardy."  <u>Id.</u> at 558.  AMTAX's complaint did "not challenge – nor even implicate – concrete federal activity (such as an attempt

-12-

by the IRS to recapture the Partnership's tax credits)." Id.
Moreover, the court noted that it was "questionable whether the
outcome of the litigation [would] have ramifications for other
cases," as "right of first refusal agreements are sui generis,"
for which "[t]here is no standardized language . . ., nor is there
any indication that developers and investors customarily use a
one-size-fits-all prototype," nor is there a basis to conclude
"that a large number of LIHTC transactions would be affected by
the federal-law issue here." Id.

Finally, the First Circuit observed that "the federal
government already 'delegates' LIHTC-related compliance matters
'to state agencies as a matter of course,' . . . and it is not
clear how a state court could destabilize the program by ruling on
the meaning of section 42(i)(7)." Id. Based on these findings,
the First Circuit concluded that there was no basis for subject
matter jurisdiction, as "the theory advanced by [AMTAX] . . . does
not suggest broad significance to the federal government or other
parties and, thus, lacks substantiality." Id.

**D. The Massachusetts State Court Litigation**

After the Nonprofit and General Partner discovered that Alden
Torch's citizenship destroyed diversity jurisdiction in their
District of Massachusetts case, they brought a substantially

similar suit in Massachusetts state court on July 17, 2020.  See Massachusetts Action.   They sought, among other things, a declaration that the Nonprofit could validly exercise its right of first refusal without AMTAX's consent and that the Purchase Price was properly calculated.  Id.   In turn, AMTAX asserted several counterclaims, including that the General Partner breached -- and the Nonprofit aided and abetted the breach of -- its fiduciary duties by, among other things, claiming that the Purchase Price does not include an exit tax distribution to AMTAX.  Massachusetts Action, Doc. No. 17, ¶¶ 150(h), 153-159.

On June 30, 2023, after both parties cross-moved for summary judgment, the Massachusetts Superior Court issued an opinion finding in relevant part that (1) Nonprofit and General Partner were entitled to a declaration that the sale of the property to the Nonprofit did not require AMTAX's consent; (2) AMTAX was entitled to summary judgment on the remainder of the Nonprofit and General Partner's claims, concluding that the Partnership had inappropriately calculated the purchase price; and (3) the Nonprofit and General Partner were entitled to summary judgment on all counterclaims brought by AMTAX except its claim seeking a declaration that the Purchase Price had been calculated appropriately.  Massachusetts Decision at 20-24.  As to whether

exit taxes should have been included in the Purchase Price, the Massachusetts Superior Court found no clear answer after analyzing the language of the ROR Agreement, the statutory language, IRS regulations and guidance, and caselaw.  Instead, the court relied on the HUD Report to conclude that exit taxes should have been included, as the Massachusetts Supreme Judicial Court had done in similar cases.  Id. at 16-17.  However, the court found that the improper calculation of the Purchase Price could not support AMTAX'S breach of fiduciary duty counterclaims because the Partnership's interpretation of the language in the ROR Agreement and Section 42 "reflected a colorable interpretation of language in the ROR Agreement and Section 42."  Id. at 23.  Specifically, the court reasoned:

> As noted above, there is no case law or regulatory guidance interpreting the phrase "taxes attributable to such sale", and the meaning of that phrase is not, at first blush, entirely clear. A legitimate dispute such as this, without more, does not amount to breach of the duty of loyalty and good faith. Second, it is unclear what harm [AMTAX] suffered given that they successfully prevented the sale . . .

Id.

The Nonprofit and General Partner applied for direct appellate review of the court's decision granting summary judgment on all but one of their claims, which the Massachusetts Supreme

Judicial Court granted on February 20, 2024.  The appeal is now pending.

### E.  This Litigation

Finally, turning to the instant case, AMTAX alleges that CohnReznick entered into a "secret agreement" with the Partnership's general partner, TD II, to calculate a purchase price that excluded exit taxes and thereby failed to comply with Section 42(i)(7).  Compl. ¶ 6.  Specifically, AMTAX asserts four causes of action against CohnReznick: (1) breach of fiduciary duty; (2) professional negligence; (3) fraud; and (4) unjust enrichment. Id. ¶¶ 112-145.

On May 23, 2023, this Court exercised its sua sponte authority to stay the case pending the outcome of the summary judgment motions in the Massachusetts Action.  ECF Nos. 20, 24.  After the Nonprofit and General Partner filed an interlocutory appeal in the Massachusetts state court litigation, the Court lifted its stay in a July 27, 2023 conference and permitted the parties to bring their proposed motions while the appeal was pending.  ECF No. 28.  On August 11, 2023, the Court set a schedule for the parties to brief the motion to dismiss.  ECF No. 30.

On September 1, 2023, CohnReznick filed its motion to dismiss, ECF No. 33, and accompanying memorandum of law, ECF No. 33-10,

along with supporting declarations and exhibits, ECF Nos. 33-1 –
33-9.  On September 14, 2023, the Nonprofit, a non-party, filed a
motion to intervene and dismiss, ECF No. 35, along with a
memorandum of law, ECF No. 36, and supporting exhibits, ECF Nos.
36-1 – 36-6.  On October 6, 2023, AMTAX filed its memorandum of
law in opposition to defendant's motion, ECF No. 42 ("Opp."), and
on October 20, 2023, its memorandum of law in opposition to the
Nonprofit's motion, ECF No. 43.  On October 30, 2023, CohnReznick
filed its reply brief, ECF No. 44 ("Reply"), and on November 13,
2023, the Nonprofit filed its reply brief, ECF No. 45.  On November
17, 2023, AMTAX sought leave to file a sur-reply memorandum of law
in opposition to both CohnReznick's and the Nonprofit's motions to
dismiss, which the Court granted on November 20, 2023.  See ECF
No. 46-1 ("Sur-Reply"); see also ECF Nos. 46-48.

## LEGAL STANDARD

CohnReznick and proposed intervenor move to dismiss this
action under Rule 12(b)(1) for lack of subject matter jurisdiction
and Rule 12(b)(6) for failure to state a claim.  See Fed. R. Civ.
P. 12(b)(1), (6).  "When presented with motions to dismiss pursuant
to both Rules 12(b)(1) and 12(b)(6), the Court must first analyze
the Rule 12(b)(1) motion to determine whether the Court has the
subject matter jurisdiction necessary to consider the merits of

the action." <u>Khodeir v. Sayyed</u>, No. 15 Civ. 8763 (DAB), 2016 WL 5817003, at *3 (S.D.N.Y. Sept. 28, 2016) (internal quotation marks and citation omitted); <u>see</u> <u>Town of West Hartford v. Operation Rescue</u>, 915 F.2d 92, 99 (2d Cir. 1990) ("The question of subject matter jurisdiction must be confronted at the threshold of the case.").

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." <u>Tandon v. Captain's Cove Marina of Bridgeport, Inc.</u>, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). Additionally, the court may "refer to evidence outside the pleadings." <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000); <u>see also</u> <u>APWU v. Potter</u>, 343 F.3d 619, 627 (2d Cir. 2003) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."); <u>Kamen v. Am. Tel. & Tel. Co.</u>, 791 F.2d 1006, 1011 (2d Cir. 1986) ("when, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise"). The burden of proof is placed on the plaintiff, who "must prove the existence of subject

matter jurisdiction by a preponderance of the evidence." <u>Moser v.</u>
<u>Pollin</u>, 294 F.3d 335, 339 (2d Cir. 2002).

### A.   **Federal Question Jurisdiction and the <u>Grable</u> Doctrine**

As "courts of limited jurisdiction," federal courts possess
"only that power authorized by Constitution and statute." <u>Kokkonen</u>
<u>v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994).
Congress has granted federal courts jurisdiction over actions
"arising under the Constitution, laws, or treaties of the United
States."  28 U.S.C. § 1331.  "[D]eterminations about federal
jurisdiction require sensitive judgments about congressional
intent, judicial power, and the federal system." <u>Merrell Dow</u>
<u>Pharms. Inc. v. Thompson</u>, 478 U.S. 804, 810 (1986).  Moreover, the
Supreme Court has "forcefully reiterated" the "need for prudence
and restraint in the jurisdictional inquiry[.]"  <u>Id.</u>

Typically, plaintiffs invoke federal-question jurisdiction by
pleading causes of action created by federal law.  <u>See</u> <u>Gunn v.</u>
<u>Minton</u>, 568 U.S. 251, 257 (2013).  However, even when a plaintiff
pleads only state-law causes of action, federal jurisdiction may
still exist in "a special and small category of cases," <u>Empire</u>
<u>Healthchoice Assurance, Inc. v. McVeigh</u>, 547 U.S. 677, 699 (2006),
namely, those that "implicate significant federal issues," <u>Grable</u>
<u>& Sons Metal Products, Inc. v. Darue Eng'g & Mfg.</u>, 545 U.S. 308,

312 (2005) ("Grable"); see also NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1019 (2d Cir. 2014) ("[T]he Supreme Court has been sparing in recognizing state law claims fitting this criterion."). It is well-settled that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharms., 478 U.S. at 813; see also Grable, 545 U.S. at 314 (the presence of a federal issue does not operate "as a password opening federal courts to any state action embracing a point of federal law.").

The Supreme Court has established a four-part test used to determine whether federal question jurisdiction exists. Grable, 545 U.S. at 314; Gunn, 568 U.S. at 258. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn, 568 U.S. at 258. This is not a balancing test -- jurisdiction is only proper "[w]here all four of these requirements are met." Id. The presence of these four factors indicates a "'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting

Congress's intended division of labor between state and federal courts." Id. (quoting Grable, 545 U.S. at 313-314).

## B. Application

In the instant case, AMTAX alleges that the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 "because the action raises necessary, disputed, and substantial issues relating to Section 42(i)(7) of the [Internal Revenue Code] and its interplay with other provisions of the [Internal Revenue Code] and corresponding federal regulations that extend well beyond Section 42." Compl. ¶ 16. AMTAX attempts to distinguish this case from the Federal Massachusetts Action by arguing that the case in front of the First Circuit "dealt primarily with the interpretation of the partnership agreement," Opp. at 8, while the instant case requires the Court to interpret Section 42(i)(7), see Opp. at 2, 7-8; Sur-Reply at 2. AMTAX contends that the First Circuit declined to reach the question of whether such claims would support federal question jurisdiction. Sur-Reply at 2; AMTAX Holdings 227, LLC, 15 F.4th at 558-59 (observing that AMTAX's complaint "suggest[ed] that interpretation of section 42(i)(7) might be necessitated by claims for breach of provisions of the Agreement requiring TD II not to endanger tax benefits and to comply with

section 42(i)(7)," but, because AMTAX never fleshed out that theory, it was not properly before the court).

CohnReznick maintains that none of the four <u>Grable</u> factors has been met and that the Court thus lacks subject matter jurisdiction over AMTAX's state law claims.  It also argues that the Federal Massachusetts Action is instructive in that the First Circuit already found that disputes relating to the ROR Agreement do not support federal question jurisdiction.  According to CohnReznick, the First Circuit's reasoning applies equally here because defendant "performed the [right of first refusal] calculation in accordance with its review of the [<u>ROR Agreement</u>]." Reply at 3 (emphasis in original).

This Court recognizes that the allegations and parties differ slightly in the instant case from those at issue in the Federal Massachusetts Action.  However, as in the Federal Massachusetts Action, AMTAX has not sustained its burden of proving by a preponderance of the evidence that its claims depend on federal tax law rather than the parties' interpretation of a sui generis contract.  Thus, the First Circuit's opinion is highly instructive to this Court's analysis.  The Court will now consider each <u>Grable</u> prong in turn.

### 1. The Federal Issue is Not Necessarily Raised

The first prong of the <u>Grable</u> test considers whether a state law claim necessarily raises a question of federal law.  This requirement is met where "the plaintiff's right to relief necessarily depends on resolution of a . . . question of federal law."  <u>Empire Healthchoice Assurance</u>, 547 U.S. at 690 (internal quotation marks omitted); <u>see also</u> <u>New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.</u>, 824 F.3d 308, 315–16 (2d Cir. 2016) ("<u>Jacobson</u>") ("A state-law claim 'necessarily' raises federal questions where the claim is affirmatively 'premised' on a violation of federal law" (citing <u>Grable</u>, 545 U.S. at 314)). Federal jurisdiction only lies if "a right or immunity created by the Constitution or laws of the United States . . . [is] an element, and an essential one, of the plaintiff's cause of action." <u>Tantaros v. Fox News Network, LLC</u>, 12 F.4th 135, 141 (2d Cir. 2021).  The inquiry "must be unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case."  <u>Id.</u> at 141-42 (internal quotation marks and citation omitted).  "[A] mere speculative possibility that a federal question may arise at

some point in the proceeding" is insufficient to establish federal jurisdiction.  Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 (1983).

Here, AMTAX argues that a federal issue is necessarily raised because its claims require the interpretation of Section 42(i)(7) and other related Internal Revenue Code (the "Code") provisions. Compl. ¶ 16.  Specifically, plaintiff alleges that (1) its breach of fiduciary duty claim depends on defendant's calculation of the purchase price in a manner that "was inconsistent with federal tax law," id. ¶ 118; (2) its professional negligence claim relates to the same calculation that "threaten[ed] the tax benefits AMTAX received over the life of the Partnership" by excluding exit taxes, Opp. at 9, Compl. ¶ 126; (3) it "reasonably relied on" defendant's misrepresentation that it would provide independent advice to protect its tax status, Compl. ¶ 139; and (4) defendant was unjustly enriched by calculating the purchase price incorrectly in order to "ingratiate itself to the low-income housing nonprofit community," id. ¶ 143; see also Opp. at 8-9.  According to plaintiff, "[e]ngrained in each of these allegations is the issue of whether CohnReznick's tax advice and calculations were consistent with federal tax law," which requires the interpretation of the Code. Opp. at 9. CohnReznick, on the other

-24-

hand, maintains that plaintiff has not necessarily raised a federal issue because "a finding . . . that [CohnReznick] owed no duty to AMTAX would result in the dismissal of AMTAX's claims without analysis of the Code." Reply at 4; see also Mot. at 12-13.

This Court agrees with CohnReznick, though based on slightly different reasoning. Despite AMTAX's repeated attempts to characterize the purchase price as having been calculated pursuant to Section 42(i)(7), see, e.g. Compl. ¶¶ 41, 88, 118, 127, 128, 143, 145, it is clear from the documents attached to AMTAX's complaint that the price was, in fact, calculated based on the language contained in the ROR Agreement, see ECF No. 1-3 at 2-3 (an email chain between CohnReznick and TDC personnel discussing the calculation of the purchase price, in which TDC's counsel circulated the language of the ROR Agreement's purchase price provision while making no reference to Section 42(i)(7)); see also ROR Agreement at 1-2. Thus, AMTAX's argument that its claims rest on the interpretation of Section 42(i)(7), rather than the ROR Agreement, is too tenuous to support federal jurisdiction. See Arbaugh v. Y&H Corp., 546 U.S. 500, 513 n.10 (2006) ("A claim invoking federal-question jurisdiction . . . may be dismissed for want of subject-matter jurisdiction if it is not colorable, i.e.,

if it is 'immaterial and made solely for the purpose of obtaining jurisdiction'").

Moreover, plaintiff's attempt to compare this case to Jacobson is unavailing. Opp. at 9. Jacobson arose from a qui tam action in which defendant allegedly filed false tax returns in order to claim federal income tax exemptions for pooled residential mortgage trusts. 824 F. 3d at 317. Liability there was predicated explicitly on the interpretation of certain definitions within the Code and federal regulations, including "real estate mortgage investment conduit," "qualified mortgages," and "defective obligation." Id. at 312, 317. Here, by contrast, plaintiff simply does not assert -- nor could it given the e-mail chain attached to its complaint, ECF No. 1-3 -- that CohnReznick calculated the price based on the Section 42(i)(7) of the Code rather than the ROR Agreement. Nor does plaintiff implicate the proper interpretation of Section 42(i)(7) by alleging a breach of contract claim that the ROR Agreement obligated the parties to comply with the statute or to avoid endangering plaintiff's tax benefits. See AMTAX Holdings 227, LLC, 15 F.4th at 558-59. Rejecting AMTAX's assertion that its case "necessarily raises a federal issue," the First Circuit noted that "Section 42(i)(7) provides only that 'no Federal income tax credit shall fail to be allowable' when a qualifying

right of first refusal is in effect.  Nothing in the statute either suggests or implies that it voids noncompliant right of first refusal agreements."  Id. at 557.  Therefore, this case does not "necessarily raise" the federal question of the correct interpretation of Section 42(i)(7).

### 2. The Federal Issue is Actually Disputed

Although it is not necessary for the Court to consider the remaining Grable factors, it will do so for the sake of completeness.  See Gunn, 568 U.S. at 258.  A federal issue is "actually disputed" where the question is "the central point of dispute" between the parties.  Id. at 259.  Here, AMTAX argues that the federal issue is actually disputed because its "theory of liability involves a construction of Section 42(i)(7) and an interpretation of the Code that CohnReznick disputes," Opp. at 10, while CohnReznick maintains that the central issue in dispute is whether defendant owed any duty to plaintiff "given the lack of privity between the parties," Mot. at 13.

The Court does not doubt that the parties dispute the meaning of Section 42(i)(7) and whether CohnReznick acted in accordance with the statute.  Regardless, the other three Grable requirements have not been satisfied.

### 3. The Federal Issue is Not Substantial

The third factor, that the federal issue be "substantial," requires the Court to determine whether the purported federal issue is "importan[t] . . . to the federal system as a whole." <u>Gunn</u>, 568 U.S. at 260. "[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit." <u>Id.</u> Thus, "courts have typically found a substantial federal issue only in those exceptional cases that go beyond the application of some federal legal standard to private litigants' state law claims, and instead implicate broad consequences to the federal system or the nation as a whole." <u>Pritika v. Moore</u>, 91 F. Supp. 3d 553, 558 (S.D.N.Y. 2015); <u>see also</u> <u>Gunn</u>, 568 U.S. at 263-64 (noting that the "resolution of a patent issue in the context of a state legal malpractice action can be vitally important to the particular parties in that case," but that more is needed to "demonstrat[e] that the question is significant to the federal system as a whole"). An issue is likely to be substantial if it "present[s] a nearly pure issue of law . . . that could be settled once and for all and thereafter would govern numerous . . . other cases." <u>Empire Healthchoice Assurance</u>, 547 U.S. at 700. By contrast, cases that are "fact-bound and situation-specific . . . are not sufficient to establish federal arising under jurisdiction."

Gunn, 568 U.S. at 263 (internal quotation marks and citation omitted).  "[S]ubstantiality must be determined based on a careful, case-by-case judgment."  NASDAQ OMX Group, 770 F.3d at 1028.

According to AMTAX, the alleged federal interest here -- whether CohnReznick correctly calculated the purchase price in accordance with Section 42(i)(7) -- is "plainly substantial" because it "involves federal tax law" and "implicates not only the collection of tax revenue by the Treasury, but also the proper functioning of a federal program that is based, in significant part, on tax incentives."  Opp. at 10-11.  CohnReznick, on the other hand, maintains that AMTAX's claims do not implicate federal activity, as the IRS is not a party to this action, Mot. at 13-14, and plaintiff is not challenging "the Partnership's right to collect tax credits for which AMTAX has already enjoyed the benefit," Reply at 5.

AMTAX's argument is unpersuasive, as its state-law claims ultimately rest on the interpretation of the ROR Agreement's purchase price provision, not federal tax law.  See supra 25-27.  As the First Circuit pointed out, "right of first refusal agreements are sui generis."  AMTAX Holdings 227, LLC, 15 F. 4th at 558.  This point is bolstered by at least one of the publications cited in AMTAX's complaint, which explains the many ways in which

participants in the LIHTC program may structure their right of
first refusal agreements with regard to both pricing and terms.
Compl. ¶ 37; see HUD Report at 29-31.  Thus, this case is too
"fact-bound and situation-specific," Empire Healthchoice
Assurance, 547 U.S. at 700–701, to "suggest broad significance to
the federal government or other parties," AMTAX Holdings 227, LLC,
15 F.4th at 558.

AMTAX attempts to avoid this outcome by relying on Grable and
Jacobson for the general proposition that "claims requiring the
interpretation of the federal tax code raise a substantial federal
question."  Opp. at 8; see also id. at 10 (citing Grable, 545 U.S.
at 315, and Jacobson, 824 F.3d at 318).  However, unlike in Grable,
plaintiff's claims do not "center[] on the action of a federal
agency (IRS) and its compatibility with a federal statute," but
rather on a straightforward contract interpretation question
triggered by a dispute between private litigants.  Empire
Healthchoice Assurance, 547 U.S. at 700.

And, in Jacobson, the Second Circuit found that the federal
question was substantial because the issue "govern[ed] what is now
a trillion-dollar national [mortgage-backed securities] market"
and because the plaintiff's claims "raise[d] a threshold question
of law relating to mortgage-backed securities generally."  824

F.3d at 318.  Conversely, AMTAX has failed to "furnish[] any basis for concluding that a large number of LIHTC transactions would be affected by the federal-law issue here," i.e., whether a right of first refusal negotiated between parties involved in the LIHTC program must include exit taxes when calculating the purchase price.  AMTAX Holdings 227, LLC, 15 F.4th at 558.  In fact, the HUD Report relied on by AMTAX observed that "exit taxes are not a major issue in establishing Year 15 sales prices," with "[o]nly one syndicator . . . nam[ing] recovery of exit tax liability as a goal they seek to achieve for the LP investors."  See HUD Report at 31 (emphases added).  Thus, even if AMTAX's claims did necessitate an interpretation of Section 42(i)(7), this Court is not convinced that this case would "implicate broad consequences to the federal system or the nation as a whole," which are required to establish federal question jurisdiction.  Pritika, 91 F. Supp. 3d at 558; see also Mikulski v. Centerior Energy Corp., 501 F.3d 555, 570 (6th Cir. 2007) (citing Grable, 545 U.S. at 319, for the proposition that "[w]hile the federal government may have an interest in the uniform application of regulations that relate to the collection of taxes, it has only a limited interest in private tort or contract litigation over the private duties involved in that collection. . . . The government is free to interpret and

apply the tax code as it sees fit, without the slightest regard
for this lawsuit.").

Finally, plaintiff relies on <u>Riseboro Cmty. Partnership v.
SunAmerica Housing Fund No. 682</u>, 401 F. Supp. 3d 367 (E.D.N.Y.
2020) to argue that the "proper meaning of Section 42(i)(7) is a
substantial and disputed issue of federal tax law that should be
decided in federal court."  Opp. at 2, 11.  However, <u>Riseboro</u> is
also readily distinguishable.  There, the plaintiff alleged that,
in order to determine whether the term "right of 1st refusal" in
Section 42(i)(7) differed from its meaning under New York common
law, the applicable agreement "'[could not] be interpreted purely
under New York common law, but <u>must</u> be interpreted to be consistent
with the statutory scheme of Section 42'".  <u>Riseboro</u>, 401 F. Supp.
3d at 373 (quoting Riseboro's complaint) (emphasis added).  Because
that assessment "would <u>not</u> be based on the specific language of
the [parties' right of first refusal agreement] but rather on its
interpretation of Congress' intent in drafting," the court found
that this "purely legal question" was "substantial and [would] be
applicable to many other LIHTC agreements nationwide."  <u>Id.</u> at 374
(emphasis added).  By contrast, AMTAX has failed to demonstrate
that its claims depend on the interpretation of the Tax Code rather
than the specific language of the ROR Agreement

-- in fact, its own supporting documents suggest otherwise.  ECF No. 1-3 at 2-3.  Accordingly, the Court agrees with the First Circuit that "it is questionable whether the outcome of the litigation will have ramifications for other cases."  AMTAX Holdings 227, LLC, 15 F.4th at 558.

### 4. The Exercise of Federal Jurisdiction Would Disrupt Congress' Carefully Drawn Scheme

Finally, the Court turns to the fourth requirement under Grable: whether the exercise of federal jurisdiction would disrupt the federal-state balance.  "[E]ven when the state action discloses a contested and substantial federal question . . . the federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."  Grable, 545 U.S. at 313-14.  "[D]eterminations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system."  Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 810 (1986).  In determining whether a federal issue can be resolved in federal court without disrupting the federal-state judicial balance, courts should consider (1) whether Congress has expressed any preference for state versus federal jurisdiction over the type of claim at issue; (2) any impact on the volume of

-33-

federal court litigation if jurisdiction is accepted; (3) the
possibility of causing a significant shift of what were
traditionally state cases into federal cases; and (4) the
litigants' interest in a federal forum.  See Jacobson, 824 F.3d at
316.

AMTAX claims that a finding of federal jurisdiction here would
not "trigger a voluminous amount of cases or transform state court
litigation" because "it is the rare such action that hinges on the
proper interpretation of an admittedly unique [right of first
refusal agreement] under federal tax law."  Opp. at 11 (quoting
Riseboro, 401 F. Supp. 3d at 376 (internal citation and quotation
marks omitted)).  According to plaintiff, CohnReznick's arguments
to the contrary are improperly premised on cases concerning
accountant errors where the interpretation of federal tax law was
not in dispute, while failing to provide any persuasive support
for its position that state-law claims relating to accountant error
can support federal jurisdiction.  Id.

In response, CohnReznick maintains that it is well-
established that state law malpractice claims cannot satisfy this
Grable element, as it would open the floodgates to the filing of
malpractice claims in federal court.  Mot. at 15 ("Every plaintiff
who has a malpractice claim against an accountant that involves

the tax Code (which accountants rely on with regularity) and every plaintiff who has a malpractice claim against a lawyer that requires interpretation of any federal statute could file such claims in federal court.").  This Court agrees.

While "state court is not the traditional forum for interpretation of the federal tax laws," Jacobson, 824 F.3d at 318, the states "have 'a special responsibility for maintaining standards among members of the licensed professions,'" Gunn, 568 U.S. at 264; see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 769 (2018) (citing NAACP v. Button, 371 U.S. 415, 438 (1963)) ("Longstanding torts for professional malpractice . . . 'fall within the traditional purview of state regulation of professional conduct.'"); Klein v. Aicher, 19 Civ. 9172 (RA), 2020 WL 4194823, at *5-6 (S.D.N.Y. Jul. 21, 2020) (dismissing for lack of subject matter jurisdiction because, among other reasons, plaintiff's state law claims that required some consideration of a federal statute nonetheless raised "difficult issues" concerning legal malpractice and requirements of privity under New York law). Allowing federal jurisdiction over countless state-law tort claims concerning accountants' interpretation of the Code would clearly disrupt the appropriate balance of federal and state judicial responsibilities, as it is hardly "the rare . . . case [involving

accountant error] that raises a contested matter of federal [tax] law." Jacobson, 824 F.3d at 316 (citing Grable, 545 U.S. at 315); see also Gunn, 568 U.S. at 263-64 (federal question jurisdiction not triggered for malpractice claims relating to patent litigation because the resolution of a "hypothetical patent issue" insufficiently implicated a federal interest, particularly given state courts' role as the traditional forum for malpractice cases).

Moreover, as the First Circuit noted, Congress has delegated the oversight of compliance with LIHTC program requirements to state agencies, suggesting that states are entirely capable of interpreting the provisions of the Code relating to the LIHTC program. AMTAX Holdings 227, LLC, 15 F.4th at 558. Given this delegation, we agree that it is unclear "how a state court could destabilize the program by ruling on the meaning of section 42(i)(7)." Id.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss for lack of subject matter jurisdiction is granted without prejudice. See Katz v. Donna Karan Co., 872 F.3d 114, 121 (2d Cir. 2017) ("[W]hen a case is dismissed for lack of federal subject matter jurisdiction, Article III deprives federal courts of the power to dismiss the case with prejudice.") (internal quotation

marks and citation omitted).  Having concluded that the Court lacks subject matter jurisdiction in this case, we do not reach defendant's motion to dismiss for failure to state a claim or the Nonprofit's motion to intervene.  The Clerk of the Court is respectfully directed to terminate the motions pending at ECF Nos. 33 and 35 and dismiss the action.

**SO ORDERED.**

Dated:   June 4, 2024
         New York, New York

_____
     NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE